UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
KEITH B. DIGGS,                     )
                                    )
            Plaintiff,              )
                                    )   Civil Action No. 05-1112 (EGS)
            v.                      )
                                    )
JOHN E. POTTER,                     )
POSTMASTER GENERAL                  )
                                    )
            Defendant.              )
                                    )
_____)


**MEMORANDUM OPINION**


    Plaintiff Keith B. Diggs is an African-American male
formerly employed by the United States Postal Service ("the
Postal Service," "USPS," or "the agency"). He claims that his
employer discriminated against him on the basis of his race,
gender, age, and disability, retaliated against him for
complaining about that discrimination, and subjected him to a
hostile work environment in violation of Title VII of the Civil
Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").
Defendant has moved for summary judgment on all of plaintiff's
claims. Upon consideration of the motion, the response and reply
thereto, the applicable law, and the entire record, the Court
**GRANTS** defendant's motion for summary judgment.

## I.   **BACKGROUND**[1]

Plaintiff began working for the Postal Service on February 14, 1987.  He was working as a Tractor-Trailer Operator, Full Time, Motor Vehicle Craft before he sustained an occupational injury that rendered him incapable of performing the duties of that position.  From May 20, 1997 until April 20, 1998, plaintiff was on leave due to this injury, and he received workers' compensation through the U.S. Department of Labor Office of Workers' Compensation Programs ("OWCP").  (Pl. Opposing Facts ["Pl. Facts"] at 3.)  In March, 2008, he provided USPS with documentation from his health care provider that he could return to work subject to certain limitations.  As a result, on April 17, 1998 the USPS offered plaintiff a limited duty rehabilitation

---

[1] Unless otherwise noted, these facts are drawn from defendant's statement of material facts and were not disputed by plaintiff. The Court notes that plaintiff has not complied with Local Civil Rule 7(h).  While plaintiff provides a few record citations in his statement of material facts, he overwhelmingly fails to include "references to the parts of the record relied on to support the statement" as required by Rule 7(h). *See generally* Pl. Opposing Facts [Doc. 56-2].  A district court "is under no obligation to sift through the record . . . in order to evaluate the merits of [a] party's case." *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 154 (D.C. Cir. 1996). Rather, consistent with Rule 7(h), a court determining whether to grant summary judgment may rely on the parties' separate statements of material facts and the record material they reference, and may "treat as admitted all facts not controverted" by competent evidence in the statement of genuine issues filed in opposition to the motion. *See Waterhouse v. District of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002).

job offer.[2] (Pl. Att. 1, Ex. 7 (Memo from K. McGovern to K. Diggs.))

Plaintiff accepted the rehabilitation job offer. He returned to work on April 25, 1998 in the position of full-time Modified Mail Processor at the Curseen-Morris Processing and Distribution Facility ("P&DC") in Washington, D.C..

Plaintiff's second amended complaint alleges multiple claims arising from eight years of alleged discrimination and harassment by his superiors from 1998, when he returned to work at the Postal Service, until his employment was terminated in 2006. Pending before the Court are the events underlying five separate administrative complaints, two decisions from an EEO Administrative Judge, and three decisions from the EEO's Office of Federal Operations. This opinion considers, and resolves, all of plaintiff's underlying claims.

### A.    Plaintiff's Medical Conditions

As set forth above, plaintiff suffered an occupational injury in May 1997 that rendered him incapable of performing his

---

[2] As this Court has explained, "for workplace injuries, the Postal Service offers 'limited duty' assignments . . . because the Federal Employees Compensation Act ("FECA"), 5 U.S.C. § 8101 *et seq.,* requires that federal employees injured on the job be compensated for their injuries, and the Secretary of Labor requires that the Postal Service make special efforts to employ those injured employees, who will otherwise be compensated for doing nothing. The [OWCP] administers the FECA and is required to provide for limited duty jobs to accommodate employees with compensable job-related injuries." *Franklin v. Potter*, 600 F.Supp.2d 38, 58 n.7 (D.D.C. 2009) (internal citations omitted).

duties as a motor vehicle operator.  On March 13, 1998,
plaintiff submitted to USPS a Duty Status Report (Form CA-17).
This form is used by OWCP "to assess whether an employee who has
suffered a work-related injury can be accommodated with limited
duties that do not interfere with the employee's medical
restrictions." *Smith v. U.S. Postal Service*, 36 Fed. Appx. 440,
444 (Fed. Cir. 2002).  On or about March 27, 1998, he submitted a
Work Restriction Evaluation Form (Form OWCP-5).  Both forms were
signed by Barbara A. Shaver, CRNP (Certified Registered Nurse
Practitioner).  Nurse Shaver diagnosed plaintiff with a herniated
disc.  (Pl. Att. 1, Ex. 19d (CA-17, Mar. 11, 1998).)  She
described her clinical findings as "pain in back radiating to
right leg." (*Id.*)  Nurse Shaver also diagnosed plaintiff with
degenerative joint disease in his right knee.  (*Id.*)  She stated
that plaintiff had been totally disabled until March 16, 1998,
and that he was able to resume work, but would have a partial
disability from March 16, 1998 to September 16, 1998.  Nurse
Shaver further determined that plaintiff could resume work for
eight hours per day subject to, inter alia, the following work
restrictions: intermittently sit and walk eight hours, squat,
kneel and stand four hours, lift up to 20 pounds, climb and twist
two hours, push and pull up to 30 pounds.  Nurse Shaver concluded
that plaintiff was permanently unable to drive a tractor trailer.

(Pl. Att. 1, Exs. 19d and 19o (Shaver Evals. Mar. 11, 1998 and Mar. 27, 1998).)

As a result of his workplace injury and the documentation plaintiff presented, the Postal Service offered plaintiff a limited duty assignment.  Specifically, on April 17, 1998, the USPS extended plaintiff a Rehabilitation Job Offer with the following duties: "employee will be required to start equipment, clear jams that don't require hand tool, and notify maintenance of machinery malfunction.  Employee will clear mail from bins, and place in trays, and load letter mail onto ledge to be processed through machinery." (Pl's Att. 1, Ex. 7.)  This job offer was determined to be "within the following medical limitations: Employee is able to intermittently sit and walk eight hours, squat, kneel and stand four hours.  Employee is able to lift up to 20 pounds, climb and twist two hours." (*Id.*)

Later in 1998, Dr. Steven Taub evaluated plaintiff following a flare-up of symptoms after he stooped to light fireworks on July 4, 1998.  (1998 Report on Investigation ("1998 ROI") Exs. 19A-C (Taub Consult Oct. 6, 1998).)[3]  He diagnosed plaintiff "with known . . . disc disease causing low back problems," and advised that "bending, stooping, lifting, twisting, and excessive

---

[3] The record in this case contains three EEO Reports on Investigation ("ROI"): 1998, 2000 and 2006.  The ROIs contain the EEO's case files for plaintiff's EEO complaints.  They are referenced throughout as "1998 ROI", "2000 ROI", and "2006 ROI".

sitting can exacerbate the condition." (*Id.*) Dr. Taub advised plaintiff to "try to change his posture frequently with sitting no longer than 15 minutes at a time and no excessive bending, twisting or lifting." (*Id.*) Dr. Taub did not evaluate plaintiff for specific functional capabilities. (*Id.*)

Plaintiff submitted a Duty Status Report (CA-17) to the USPS EEO Office in May 2003. (Pl. Att. 4, Ex. 6 (Form CA-17, Exam Date Mar. 25, 2003, signed May 20, 2003).) He was specifically evaluated for his ability to perform the qualifications of Automation Mail Processor. Form CA-17 lists the usual work requirements for the position, and requires the employee's medical provider to state whether the employee can perform these duties. Plaintiff could perform most, but not all, of the usual work requirements for Automation Mail Processor. He could (1) lift 20 pounds intermittently for eight hours; (2) stand intermittently for four hours; (3) walk intermittently for four hours; (4) perform simple grasping continuously for eight hours; and (5) perform fine manipulation, including keyboard skills, as required by the position. (*Id.*) He could only sit intermittently for four hours, however, while the position calls for eight, and he could not perform any above-the-shoulder work while the position calls for four hours of intermittent reaching above the shoulder. (*Id.*)

The 2003 CA-17 form also indicated that plaintiff could perform a number of tasks in addition to those required for the Automation Mail Processor position.  Specifically, plaintiff could climb, kneel, bend/stoop, twist, pull/push, drive a vehicle, operate machinery, work in temperature extremes and high humidity, and work with chemicals, solvents, fumes, dust, and noise for some or all hours during the workday.  (*Id.*)

Plaintiff submitted one additional Form CA-17 to USPS on December 1, 2005.  (Pl. Att. 3, Aff A. p. 27 of 39 (Duty Status Report, signed Nov. 21, 2005, date-stamped Dec. 1, 2005).)  The 2005 CA-17 indicates that plaintiff could return to work as of May 20, 2003. (*Id.*) The 2005 CA-17 also cleared plaintiff to lift 20 pounds intermittently for eight hours per day, to climb, perform simple grasping, fine manipulation, driving a vehicle, operate machinery, work in temperature extremes and high humidity, and work with chemicals, solvents, fumes, dust, and noise.  (*Id.*)  The form contains no information regarding plaintiff's ability to, inter alia, stand, sit, walk, kneel, twist, push, or pull.[4]  (*Id.*)

––––––––––––––––––––

[4] The only other evidence in the record regarding plaintiff's medical condition appears in plaintiff's EEO Investigative Affidavit dated June 27, 2006.  The plaintiff describes his physical condition as of June 2006 (after the events at issue in his Complaint) as follows:

My disabilities are two permanent partial impairments Left Foot Great Toe, Right Knee [...] severe arthritic condition, same as toe left foot, which affects my

**B. Plaintiff's Workplace Complaints**

  **1.  Events of 1998: Sick leave or Leave Without Pay, the Snow Arbitration Award.**

From approximately April through December 1998, plaintiff was assigned to the position of a Modified Mail Processor at the PD&C.  Plaintiff did not, however, work this entire time; he was absent from work from June 30 through July 20, 1998.  During that time he received payment of $1,448.83 for work related injuries from OWCP.  These payments were intended to cover plaintiff's entire absence in June and July.   Both USPS and OWCP prohibit employees from receiving sick leave payments from the Postal Service while accepting payments from OWCP.

Plaintiff contacted USPS on at least two occasions during this period to notify the Agency he would be absent from work.  On July 5, 1998, plaintiff called in and requested 40 hours of leave for the week of July 5 - 11, 2008.  Plaintiff states that he requested leave without pay ("LWOP") for the week, however his request was noted as "sick leave" on the leave slip the Postal Service generated for his absence.  (Pl. Att. 1, Ex. 1 (Form

─────────────

     walking, running . . . I cannot work above my head and
     shoulders, walking, running I can't run anymore, I
     can't lift any weight greater than at least 25 pounds.
     Nor can I play Football, Basketball, swing baseball
     bats because of injuries.  Walking and sitting are my
     major problems, for any extended time.

(Pl. Att. 4 (Aff. A pp. 11-12 of 39.))

3971, Request for or Notification of Absence, Jul. 5-11, 1998).)

Several USPS employees signed the request and John Grier, an

Attendance Control Supervisor at the P&DC, ultimately approved

it. (1998 ROI p. 17, Aff. of John Grier.) Grier did not

personally take plaintiff's July 5, 1998 phone call. (*Id.*) He

believed that plaintiff had requested sick leave, and approved

the request, "based on the information given on the Form 3971,

leave slip, that was taken when [plaintiff] called in." (*Id.*)

Plaintiff contacted USPS again to request 48 hours of leave

without pay for the following week -- July 12 - July 19, 1998.

(Pl's. Att. 1. Ex. 1 (Form 3971 Jul. 12-19, 1998).) This time,

because the USPS recorded his request as LWOP, it was routed to

the Postal Service's Injury Compensation office instead of

Attendance Control.[5]  Injury Compensation Specialist Toni Grier

approved plaintiff's July 12 - 19 application for LWOP. (*Id.;*

*see also* 1998 ROI, p. 14, Aff. of Toni Grier.) Toni Grier has

handled all of plaintiff's OWCP claims since 1997. (Pl. Facts at

4.)

Plaintiff returned to work on July 22, 1998. (Pl. Facts at

3.) Upon his return, plaintiff "saw the [July 5] slip[] was

---

[5] Sick and annual leave is based on approval from a
supervisor, whereas leave for a work-related injury "has to be
either leave without pay, IOD [injured on duty] or COP
[continuation of pay]. Those are the only . . . forms of leave
that the injury compensation office handles." (Def. Deposition
Excerpts ("Def. Deps.") Toni Grier Dep. 43-44, Mar. 28, 2008.)

wrong, [and] indicated in his own handwriting 'comp injury' on the leave slip for July 5, 1998." (*Id.*) He did not, however, change the two instances on his Form 3971 which indicated that he had taken sick leave for that week. (Pl. Ex. 1 (Form 3971 Jul. 5-11, 1998).) Plaintiff signed the July 5 leave slip on July 22, 1998, and was paid for 40 hours of sick leave for that week. On December 10, 1998, the OWCP notified plaintiff that he had been overpaid because he had been compensated for sick leave during the week of July 5, 1998 while he was also being compensated by OWCP. (1998 ROI, Ex. 2, p. 26.) Accordingly OWCP sought return of its money.

Two days after returning to work, on July 24, 1998, USPS changed plaintiff's job status from full-time regular to part-time flexible, with an effective date retroactive to April 25, 1998. This change in status was the result of the settlement of an arbitration decision (the "Snow Arbitration Award") between the American Postal Workers Union ("APWU") and USPS management. The settlement agreement, dated July 18, 1998, provided that all employees who were reassigned when they were partially recovered from an on-the-job injury after 1994 would be converted to part-time flexible employees. Therefore, on July 24, 1998, plaintiff's status was changed to part-time flexible along with all other employees in this group.

A few months later, the APWU and the Postal Service agreed to amend their settlement agreement and remove the requirement converting full time employees to part-time flexible status. Accordingly, on December 1, 1998, plaintiff was returned to full-time status retroactive to April 25, 1998.  Plaintiff was credited for any salary and leave diminutions while he was in part-time status.

Plaintiff requested EEO counseling on August 31, 1998.  He alleged that the agency placed him on sick leave instead of LWOP from July 5 - 11, 1998 and changed his status from full-time to part-time flexible based on race, sex, age, retaliation, and disability discrimination.[6]  He filed a formal EEO complaint on November 2, 1999.  (1998 ROI p. 90 (Partial Acceptance/Partial Dismissal of a Formal Complaint, Mar. 28, 2000).)

### 2. The Events of 1999: Disputes over Sick Leave and Limited Duty Status.

Plaintiff continued to work in a "limited duty" assignment in 1999, however, he was reassigned to work as a Mail Processor in the V Street Annex, Return to Sender Unit (a different facility than the P&DC).  Plaintiff's new duties were described

_____

[6] Plaintiff previously filed several discrimination claims against the Postal Service regarding events not encompassed in this case.  (Pl. Facts at 3.)  Toni Grier knew about plaintiff's prior complaints because he told her about them in a meeting on April 20, 1998.  (*Id.*)  Grier was not involved in plaintiff's leave request for the week of July 5, 1998, however, nor was she involved in changing his job status from full-time regular to part-time flexible.  (1998 ROI p. 14 (Aff. of T. Grier).)

as manual distribution of letters within restrictions, including: "no bending, twisting or stooping, no sitting longer than 15 minutes. Needs to sit at a low case." (2000 ROI p. 11 (Aff. of Deborah Boston ("Boston Aff.")).)

Plaintiff's limited duty assignment stemmed from his on-the-job injury in 1997, which, as discussed above, was approved by OWCP and the USPS and assigned claim number 25-0514475. In August 1998, plaintiff filed an additional claim with OWCP seeking a determination that he sustained another compensable on-the-job injury: a mental and emotional injury caused by stress due to harassment at work. (1998 ROI, Ex. 12 p. 53 (Jun. 10, 1999 letter from OWCP to plaintiff.)) This claim was assigned number 25-50529977.

On June 10, 1999, the Department of Labor issued a ruling denying plaintiff's stress and harassment claim – number 25-50529977. (*Id.*) The USPS Injury Compensation office received a copy of OWCP's denial and, as it does with all denied claims, informed the appropriate operations managers of the denial. Specifically, on July 13, 1999, Senior Injury Compensation Specialist Natalia Goddard sent a memo to Operations Managers Darryl Martin and Edgar Gramblin entitled "Denied Claim by the Department of Labor". (Pl. Att. 11 (Jul. 13, 1999 Memorandum to D. Martin and E. Gramblin from N. Goddard.)) Goddard's memorandum stated "the attached ruling from the Department of

Labor is provided for your information and or action **. . . The following actions may be necessary:** [...] Ensure that employee is not on limited duty**. . . .** If you have any questions please contact Toni Grier**.**" (*Id.* (emphasis in original)) The memorandum contained no mention of plaintiff's existing worker's compensation claim for his back injury, claim number 25-0514475.

Upon notification that plaintiff's OWCP claim had been denied, Operations Manager Gramlin believed that plaintiff was able to perform his regular clerk duties and no longer needed limited duty assignment. (Pl. Att. 1, Aff. D (Aff. of Edgar Gramblin, Oct. 31, 2000 ("Gramblin Aff.")).) Gramblin did not know that plaintiff had more than one OWCP claim and plaintiff did not immediately inform him otherwise. Indeed, at that time Gramblin did not know plaintiff, nor was he aware of his previous EEO activity. (*Id.*)

Believing plaintiff was no longer eligible for limited duty, Gramblin reassigned plaintiff from his limited duty position at the V Street Annex to a regular duty assignment at the P&DC. (*Id.*) Plaintiff refused to perform his regular duty assignment. As a result, he was suspended and advised he could provide information to request a light duty assignment, which employees may receive for non-workplace injuries. (*Id.*) After approximately two days, plaintiff returned with documentation to show he had two OWCP claims, only one of which had been denied.

He was immediately returned to his limited duty job.  Plaintiff filed a grievance with his union over his suspension.  He prevailed in his grievance, and about a month after his suspension, the Agency paid him for the 19.42 hours he had been suspended.

Notwithstanding OWCP's June 10, 1999 denial of plaintiff's on-the-job injury related to stress (claim number 25-50529977), in August 1999 plaintiff submitted three requests for LWOP because of stress and cited the already-denied claim number – 25-50529977.  (Pl. Att. 1, Exs. 14, 15a, 15b (Forms 3971, Aug. 11, Aug. 12 and Aug. 13, 1999).)  None of these requests were approved.  (*Id.*)

On September 9, 1999, plaintiff submitted a request for three hours of sick leave (not LWOP, as he had in August) and cited his other OWCP claim number - 25-0514475 - which related to his back injury and had been approved in 1997.  This leave request form was initially received, as all leave slips are, by the USPS office of absence control.  (Pl. Att. 10 (T. Grier Dep. at 31.))  The absence control office routed the leave slip to the injury compensation office where it was handled by Toni Grier, who handles all injury compensation claims for employees whose last names begin with D through I.  (*Id.*)  Grier checked the "disapproved" box on the leave request, and wrote "no meds on file."  (Pl. Att. 1, Ex. 15e (Form 3971, Sept. 12, 1999).)

However, because plaintiff requested sick leave, the Injury Compensation Office should not have processed the leave request in the first instance. "To request sick leave, an employee merely had to have the leave available and make the request on the appropriate form . . . . There is no requirement that any employee have any medical information on file in order to qualify for or request sick leave." (Pl. Opp. at 20.) Grier admitted her error, explaining: "I should never have signed the sick leave slip. Sick leave . . . should be approved or disapproved by the supervisor, not by injury comp . . . leave for an injury has to be either leave without pay, IOD, or COP. Those are the only [] forms of leave that the injury compensation office handles." (Def. Deps., T. Grier Dep. at 43-44; *see also* Pl. Ex. 1, p. 14 (T. Grier Aff. Oct. 11, 2000) ("I do not normally take action on leave requests of this nature; it was an oversight that I did in this instance.").)

Once Grier had processed her "batch" of leave slips, including the slip for plaintiff, she "put them back in the envelope and sent them to Time and Attendance [or] absence control. And then . . . someone else would disburse them to the supervisors." (Pl. Ex. 10, (Grier Dep. at 31-32).) Because Grier denied plaintiff's request for sick leave, the agency treated it as a request for annual leave. Plaintiff did not have any annual leave accrued, thus, the Agency placed him in

LWOP status for three hours.  As a result, he lost three hours'
pay.

Plaintiff requested EEO counseling on September 28, 1999,
alleging that both the two-day suspension in July and the sick
leave denial in September constituted unlawful discrimination
based on retaliation for his prior EEO activity and disability.
He filed a formal complaint on December 14, 1999.  (1998 ROI p.
96 (Partial Acceptance/Partial Dismissal of a Formal Complaint,
Feb. 22, 2000).)

On June 3, 2003, the EEO consolidated plaintiff's two claims
regarding the events of 1998, as set forth in Section A above,
with his two claims regarding the events of 1999.  On March 31,
2004, an EEO Administrative Judge ("AJ") granted the Agency's
motion for summary judgment on all four of the claims, finding
that plaintiff "failed to adduce any evidence that the conduct
complained of was based on . . . his race, sex, age, disability
or prior protected activity."  (Def. Att. 2a.)  The AJ further
found that "the Agency articulated a legitimate, non-
discriminatory reason for its action[s]," which plaintiff "failed
to rebut [or] . . . proffer any evidence of pretext."  (*Id.*)
USPS issued its final agency decision on May 25, 2004
implementing the decision of the A.  (Def. Att. 2b.)  Plaintiff
appealed to the EEO Office of Federal Operations ("OFO").  On
December 5, 2005, the OFO issued a decision affirming the

Agency's final action.  The OFO found that no "reasonable fact finder could draw an inference of race, sex, age and disability determination or reprisal regarding the actions of the agency," and that plaintiff "failed to present evidence that any of the agency's actions were motivated by discriminatory animus toward [plaintiff's] protected classes."  (Def. Att. 3, p. 6.)

### 3. The Events of 2000: May 3, 2000 Overtime Dispute.

Plaintiff's complaint contains one allegation of unlawful treatment in 2000: denial of an overtime opportunity on May 3, 2000.

The Postal Service awards overtime "when employees are needed to work before or after their work schedule and also when employees are needed to work on the[ir] non-schedule[d] workdays based on the mail volume."  (Pl. Att. 2, Aff. C (Aff. of William Darryl Martin ("Martin Aff.").) Employees desiring to work overtime put their names on a voluntary 'overtime desired' list. (*Id.*)  When overtime is necessary, management reviews the overtime desired list and schedules overtime "among qualified employees doing similar work in the work location where the employees normally work."  (2000 ROI Ex. 7b, p. 41 (Collective Bargaining Agreement Between the USPS and the American Postal Workers Union, AFL-CIO, Article 8.5).)  In the Washington, D.C. area, employees may sign an overtime desired list to work on their non-scheduled workdays as well as their scheduled workdays.

(Martin Aff.; see also Pl. Att. 6 (Local Mem. of Understanding Between the Washington, D.C. Post Office, Air Mail Center, and American Postal Workers Union AFL-CIO).)  However, "those absent or on leave shall be passed over."  (2000 ROI Ex. 7b, p. 41.)

Limited duty employees such as plaintiff are not precluded from working overtime.  (Martin Aff.)  However, in order to be "qualified" to perform the overtime as set forth in the Collective Bargaining Agreement, "the employee must be able to perform the duties in the operation where the overtime is required.  If the limited duty employee can work in automation he will be allowed to work any overtime called in automation . . . if he is on the overtime desired list for automation but he/she is physically unable to perform the duties on automation he would not be selected for overtime in automation."  (*Id.*)

In the spring of 2000, plaintiff was still working in the return-to-sender unit under the direct supervision of Deborah Boston.  William Darryl Martin was the Senior Manager for Distribution Operations.  Plaintiff put his name on overtime desired lists for both his scheduled and non-scheduled days, to perform any work for which he was qualified in his location. (Def. Deps., Keith Diggs Dep. at 55.)

The return-to-sender unit moved from the V Street Annex to the P&DC during the first week in May, 2000.  (2000 ROI Aff B. (Boston Aff.).)  On Wednesday, May 3, 2000 plaintiff worked from

4:00 p.m. until 10:00 p.m.  He took annual leave for the hours he did not work.  Wednesdays were one of plaintiff's regularly scheduled workdays; his regularly scheduled hours were 4:00 p.m. to midnight.  (2000 ROI Ex. 3, p. 19 (Limited Duty Job Offer Dec. 19, 1998); Ex. 1, p. 17 (Time Summary).) Plaintiff was not offered overtime on May 3, 2000, nor was overtime awarded in the return-to-sender unit on that day.

Plaintiff sought EEO counseling to complain that he was unlawfully denied overtime based on race and disability.  (ROI 2000 p. 55 (EEO Counselor's Report Jun. 13, 2000).)  He filed a formal complaint alleging race and disability discrimination on October 3, 2000 (2000 ROI p. 52 (EEO Complaint of Discrimination in the Postal Service, Oct. 3, 2000).)  In the investigative affidavit he provided to the EEO, plaintiff alleges employees in Operations 030, 040 and 150 at the P&DC – only 100 feet from his work location once the return-to-sender unit moved to the P&DC facility – performed overtime work that "was within [his] physical restrictions . . . [he] could have performed the work in overtime status."[7] (2000 ROI Aff A., p. 8, (Diggs Aff. Mar. 1, 2001).) In response, manager Boston explained to the EEO Counselor that during the approximately five years she supervised

_____

[7] The numbers 030, 040 and 150 refer to pay locations. Plaintiff worked in pay location 396.  The parties point to no evidence in the record, and this Court is unable to find any, specifying the type of work performed at pay locations 030, 040 and 150.

the return-to-sender unit, "there was no overtime given to the employees [in the return to sender unit] . . . because of the low priority of the mail that was being worked . . . It did not warrant paying employees premium overtime pay to process it." (Boston Aff.)  She also asserted that plaintiff would not have been able to work overtime outside the return to sender unit because "his physical limitations would not allow him to work in other sections."  (*Id.*)

An EEO AJ heard plaintiff's formal complaint.  She found that no discrimination occurred, and dismissed the claim on September 3, 2003.  (Def. Att. 4.)  On September 17, 2003, the Postal Service issued a final order implementing the AJ's decision, which plaintiff appealed to the EEO's OFO.  (Def. Att. 5.)  The OFO issued a decision on March 3, 2005, which found that there was no "overtime available within [plaintiff's] pay location" on May 3, 2000, and that "even if there was overtime available on the day in question, [plaintiff] was on annual leave, and therefore ineligible for overtime."  (*Id.*)  The OFO upheld the A's decision and the Postal Service's final order that "construing the evidence to be most favorable to [plaintiff] . . . [plaintiff] failed to present evidence" that his failure to receive overtime was "motivated by discriminatory animus toward [his] protected classes."  (*Id.*)

**4.   The Events of January 2002 – February 2006: Plaintiff's Departure and Ultimate Removal from the Postal Service.**

In 2001, the P&DC (also known as "Brentwood") was targeted in an anthrax terrorist attack.  As a result, the Post Office closed the P&DC in October 2001, and its employees were transferred to other postal facilities.  (Pl. Att. 10, Grier Dep. 83.)  Plaintiff was reassigned to the Calvert Development and Design Center for a short time following the anthrax attack. (*Id.* at 84.)  There was no work, however, for plaintiff to perform.  Plaintiff and at least 30 other relocated employees "sat in a room . . . [doing] nothing." (*Id.* 83-84.)  In January 2002, Postal Service management decided that plaintiff and these other employees for whom the Agency had no work should be sent home.

On January 23, 2002, Julie E. Szarek, USPS Human Resources Manager, sent plaintiff a letter stating, in relevant part:

> Due to the closure of the Brentwood facility and its relocation to other offices, Plant Operations has indicated it is no longer able to accommodate your restrictions.  Effective Friday, January 25, 2002, you should no longer report to the Calvert worksite.
>
> Since the agency cannot provide suitable duties within your restrictions, the injury compensation office is issuing CA-7 forms for your use.  This form should be completed and submitted to this office to ensure that you are compensated through the Department of Labor, Office of Worker's Compensation Programs.
>
> If you have further concerns please contact Toni Grier, Manager, Injury Compensation, at [phone number].

21

(Pl. Att. 3, p. 4 (Letter from J. Szarek to K. Diggs, Jan. 23, 2002).)  As indicated by Szarek's letter, the CA-7 form is used by the Department of Labor OWCP to process Claims for Compensation due to, in this case, medical restrictions that precluded the USPS from finding suitable work for plaintiff. Plaintiff was among a group of "30 people or more . . . who were sent home and given CA-7s to complete and be compensated through the [OWCP] until the agency was able to provide them with work." (Pl. Att. 10 (Grier Dep. 83-84).)  The letter instructs plaintiff to file his CA-7 forms with "this office" – the injury compensation office.  (*Id.* at 91-93.)

The record contains no Form CA-7s for plaintiff between January 2002 and May 2003.  Plaintiff "turned in the CA-7s – which [USPS] say[s] they never received – to get paid.  I didn't get paid."  (Diggs Dep. 64.)   The Injury Compensation office did not receive any CA-7s from plaintiff.  (Pl. Att. 10 (Grier Dep. 91).)

On January 23, 2003, Helen T. Jackson, Attendance Control Supervisor for Tour 3,[8] sent plaintiff a memorandum via certified mail.  The memorandum states, in relevant part:

_____

[8] "Tour" is another word for shift.  At all times relevant in this action, plaintiff was assigned to Tour 3 (sometimes referred to as Tour III), which is 4:00 p.m. to midnight.  (2000 ROI Exs. 3-4, pp. 19-20 (Limited Duty Job Offers Apr. and Dec. 1998).)

A review of your record reflects an unsubstantiated
absence from duty.  Therefore, you are instructed to
submit the following documents within five calendar
days of the receipt of this letter:
- PS Form 3971 (Request for or Notification of
  Absence) and
- Medical Certificate covering your absence from
  the beginning through the present.

The Medical Certificate must provide an explanation
of the nature of your illness sufficient to indicate
you have been, or will be, unable to perform your
normal duties for the time period of your absence . . .
In addition, you are instructed to submit a PS Form
3971 and a Medical Certificate every thirty days that
you are absent thereafter to your supervisor at the
address listed below:

    Southern Maryland Processing & Dist. Ctr.
    Deborah I. Boston, ACS, Tour 3
    [Address]

If you fail to provide the required documentation
and/or fail to respond to this notice as outlined
above within five calendar[] days, the absence will
be charged to AWOL.  AWOL MAY RESULT IN DISCIPLINARY
ACTION, UP TO AND INCLUDING REMOVAL FROM THE POSTAL
SERVICE.

(Pl. Att. 3 (Jan. 27, 2003 letter from H. Jackson to K.

Diggs)(emphasis in original).)

Plaintiff did not provide his supervisor with the

information requested in the January 23, 2003 letter.  Instead,

he sought EEO counseling on January 29, 2003.  Plaintiff claimed

that he "was the only person from [the] Tour 3 injured section to

receive such a letter," and accused the Postal Service of

retaliation based on his prior EEO activity.  (Def. Att. 12

(Information for Pre-Complaint Counseling).) Plaintiff and the

Postal Service entered into a settlement on March 7, 2003, resolving his claim. The settlement states, in relevant part:

(1) [Plaintiff] shall provide to Injury Compensation [address], to the attention of Ms. Toni Grier, copies of documentation relating to the CA-7's filed following January 25, 2002, the date he was sent home following the unavailability of work. . .

(2) [Plaintiff] shall also provide written notice to Ms. Grier of his doctor's appointment to have his medical restrictions updated.

(3) Ms. Grier shall contact [plaintiff's] assigned office to have a CA-17 sent to him for submission to the medical provider at the scheduled appointment.

(4) Items 1-3 shall be completed by March 14, 2003.

(5) [Plaintiff] shall provide Ms. Grier with an updated CA-17 following his doctor's appointment. This letter shall be accompanied by a letter of job responsibilities that he feels he can perform in accordance with his restrictions.

(Pl. Att. 3, p. 9-11 (Settlement Agreement Mar. 7, 2003).)

Plaintiff failed to meet the March 14, 2003 deadline. He "attempted to confer with [] Grier . . . to inform [her] that he could not meet the provisions of . . . the Agreement on time, but he could not reach her." (Pl. Facts at 2.) Plaintiff eventually submitted a Form CA-17 dated May 20, 2003 to the EEOC office, but not to Grier or the Injury Compensation Office as required by paragraph (5) of the settlement agreement. He also failed to submit copies of the CA-7s to either the EEOC office or the Injury Compensation Office, as required by paragraph (1).

On April 17, 2003, plaintiff filed a timely EEO Complaint alleging that the Agency breached paragraph (3) of the settlement agreement by not contacting him before March 14, 2003. The Agency issued a final decision denying the breach-of-contract claim on October 29, 2004. (Def. Att. 6.) Plaintiff appealed the final agency decision to EEO's OFO, which issued its decision on April 27, 2005. The EEO found that the Postal Service "had not breached the agreement because its own actions were contingent on [plaintiff] first taking certain actions of his own," namely, sending CA-7s to Grier as required by paragraph (1) of the settlement agreement, and providing Grier with written notice of his doctor's appointment as required by paragraph (2). (Def. Att. 7.) The EEO further found that plaintiff breached paragraph (5) of the agreement by sending his CA-17 to the EEO office, not "to the Injury Compensation office, as explicitly stated in the settlement agreement." (*Id.*)

The next correspondence between plaintiff and the Postal Service did not occur until September 27, 2004. During that time, following the expiration of his state unemployment benefits in early 2003, plaintiff had obtained employment as a delivery driver for "My Florist, Exclusively Roses," and delivered floral arrangements. At some point thereafter, plaintiff left the florist position for a "better job" working for "Liberty Transportation Incorporated" as a "yard jockey" and remained

there until May 31, 2007 when the company relocated.[9] (Diggs Dep. 71-72.)

On September 27, 2004, Helen Jackson-Baker (formerly Helen Jackson), the attendance control supervisor for Tour 3, sent plaintiff another letter. She acknowledged that plaintiff had been sent home on January 23, 2002, and that the Agency's action was the genesis of his absence from work. (Pl. Att. 3, p. 6 (Sept. 27, 2004 Letter from H. Jackson-Baker to Plaintiff).) The letter explained:

> Since the agency could not provide suitable duties within your restrictions, the Injury Compensation Office issued CA-7 forms for your use. The form should have been completed and submitted to that office to insure that you were compensated through the Department of Labor, Office of Workers' Compensation Programs.
>
> The Injury Compensation Office indicated that you currently do not have an active open claim. There are no records indicating that you requested compensation from the Department of Labor. All of the employees who submitted claims for compensation due to 'no available work' were compensated through the Department of Labor.
>
> You have an obligation to notify your employer of your status. Failure to do so puts you in AWOL status.
>
> It is incumbent upon you to submit acceptable evidence to cover your absence from January 25, 2002 through your return to duty . . . [Y]ou are to submit supporting ACCEPTABLE EVIDENCE showing why you are unable to

---

[9] Plaintiff explains that: "[a] yard jockey is the tractor [that] hooks up to loaded trailers, puts them to the dock, and then they unload them. Then he comes back, gets the unloaded trailer, puts it back in the lot. That's what I did all day long. I was moving trailers back and forth." (*Id.*)

report, within five (5) calendar days from the date of
receipt of this letter, and for every thirty (30) days
thereafter that you are absent from duty.

> **HELEN JACKSON-BAKER, ACS, Tour 3**
> **[Address]**

Acceptable evidence for medical reasons is defined as
medical documentation signed and furnished by your
attending physician or other attending practitioner.
The documentation must provide an explanation of the
nature of the illness or injury causing your absence
from work . . .

Should you fail to comply with these instructions, you
will be considered in an Absence Without Official Leave
Status since January 25, 2002 and action may be taken
to remove you from the United States Postal Service.

(*Id.* (emphasis in original).)

By letter dated October 7, 2004, plaintiff responded to

Jackson-Baker, stating that "my absence from the Postal Service

is not directly related to Illness or Injury, my absence is

<u>directly</u> related to Toni Grier, Compensation Unit.  Ms. Grier has

not abided by the [settlement] agreement."  (2006 ROI (Pl. Aff.

A, p. 31 of 39 (emphasis in original)).)  Plaintiff attached a

copy of the January 25, 2002 letter from the Postal Service and a

copy of the March 7, 2003 settlement agreement to his letter.

(Pl. Att. 4, (Pl. Aff. A., p. 9 of 39).)  He did not send medical

documentation.  (*Id.*)

Jackson-Baker replied to plaintiff on October 20, 2004.  She

wrote:

You have not been to work since January 23, 2002
nor have you sent any documentation to substantiate

27

your absence.  You are required to submit acceptable
documentation immediately and every thirty (30) days
until your return to duty.

If documentation is not sent by October 27, 2004 and
you do not respond to the letter sent to you, the next
step may be taken to remove you from the Postal Service.
This letter is being sent to you to afford you the
opportunity to come in for a Pre-Disciplinary Interview.
This interview gives you the chance to tell 'your side
of the story'.

The interview is being set up for October 29, 2004 at
the [...] P&DC.

(2006 ROI Aff. A, p. 32 of 39 (Oct. 20, 2004 Letter from H.

Jackson-Baker to plaintiff).)

Plaintiff met with Jackson-Baker at the P&DC.  He "went over

verbally with [] Baker all of the evidence [he] submitted,"

namely, the January 25, 2002 letter and the 2003 mediation

agreement. (Pl. Att. 4 (Aff. A., p. 9 of 39).)  Plaintiff

"awaited further response," but "received no further input about

this matter." (*Id.*)

In May 2005, the Post Office again requested that plaintiff

provide medical documentation addressing his ability to work

between 2002 and "the present".  (2006 ROI, Ex. 7 (Letter to

plaintiff from F. Mitchell, absence control office supervisor,

Tour 3 dated May 19, 2005.))  Like the previous letters from

Baker-Jackson, the May 2005 letter from Mitchell requested past

and present medical information and updates every 30 days

thereafter, and closed with the warning that if plaintiff did not

promptly respond, "the absence will be charged to **AWOL. AWOL MAY RESULT IN DISCIPLINARY ACTION, UP TO AND INCLUDING REMOVAL FROM THE POSTAL SERVICE.**" (*Id.*) (emphasis in original.)

Hearing no response from plaintiff, Mitchell (sometimes referred to as "Bears-Mitchell") sent plaintiff a notice of another pre-disciplinary interview. (2006 ROI Ex. 8 (Letter to plaintiff from F. Bears-Mitchell dated June 16, 2005.)) Mitchell's letter states in relevant part: "Discipline is being considered. However, during the interview, you will be given the opportunity to tell your side of the story relative to why you did not respond to my notice for you to support your absence with documentation and any other information you wish to share that might prevent disciplinary action." (*Id.*) Bears-Mitchell, plaintiff, and plaintiff's union shop steward met for the pre-disciplinary interview on June 24, 2005. During the interview, plaintiff told Bears-Mitchell about his prior EEO activity. (Pl. Att. 4 (Aff. A. p. 10 of 39).) He also discussed his then-current employment driving a tractor-trailer for Liberty Transportation. (*Id.*) Plaintiff did not provide documentation regarding his medical restrictions during the period of May 20, 2003 to June 2005 at or prior to the interview. He told Bears-Mitchell that he "is ready to come back to work," asked "what medical document is needed to return to work," requested that the Postal Service "mail it" to him, and stated that he "is working

29

now." (2006 ROI Ex. 9 (Mitchell's notes of Pre-Disciplinary Interview Jun. 24, 2005).)

Bears-Mitchell did not receive the requested medical documentation from plaintiff. (Def. Deps. (Bears-Mitchell Dep. 116).) On October 25, 2005, she wrote to plaintiff again, explaining "our records do not indicate that you are unable to perform work. Therefore you are instructed to report for duty as scheduled or provide acceptable medical evidence that denotes your inability to work . . . You are being allotted five (5) days from the receipt of this letter to respond. Failure to [respond] will result in corrective action up to and including removal from the Postal Service." (2006 ROI Ex. 10 (Oct. 25, 2005 Letter from Bears-Mitchell to Plaintiff).) Plaintiff did not respond to the letter. Instead, he wrote a letter dated November 9, 2009 to his shop steward, acknowledging receipt of the October 25, 2005 letter and advising that he was filing a grievance with his union. (2006 ROI (Aff. A., p. 39 of 39).)

On December 1, 2005, plaintiff delivered one Form CA-17 to the USPS' Medical Unit. (Pl's. Att. 3 (Aff. A. 15 of 39 and 27 of 39).) The CA-17 form, dated November 21, 2005, indicates that plaintiff's health practitioner advised him to return to work, with restrictions, as of May 20, 2003. (*Id.*)

By letter dated January 12, 2006, Mitchell advised plaintiff she was "in the process of determining what, if any,

administrative action shall be taken in regard to your current work status." (2006 ROI Ex. 12.)  Mitchell directed plaintiff to report for a pre-disciplinary interview on January 18, 2006, and advised plaintiff that his "failure to report . . . will result in [Mitchell] making a decision without any input [plaintiff] may have to offer for [] consideration." (*Id.*)

Plaintiff, his union shop steward and Mitchell met for the pre-disciplinary interview as scheduled.  In her notes of the meeting, Mitchell listed among the "Nature of Infractions" to be discussed as "(1) unacceptable medical documentation; (2) where have you been since 2003".  (2006 ROI Ex. 13 (F. Mitchell's Pre-Disciplinary Interview notes, Jan. 18, 2006).)  Mitchell's notes also recount plaintiff's answers.  In response to question (1) plaintiff stated "every time he goes to the doctor there's a co-payment," and he "did not know" the USPS wanted documentation of his "diagnosis and prognosis."[10] (*Id.*)  In response to question (2), he "was sent home because there was no work for him" in 2002, and he never received "anything in writing telling him to come back to work." (*Id.*)  Plaintiff also "explained in detail about [his] EEO cases . . . and also the fact of [his] employment elsewhere." (Pl. Att. 4, (Aff. A. p. 10 of 39).)  Plaintiff did

---

[10] Mitchell explains "prognosis and diagnosis . . . might state that Mitchell was seen in my office on so and so date for a broken leg; therefore, her expected return time to work might be three months . . . It might say anything like that.  It's just a prescription pad." (Pl. Att. 9 (Mitchell Dep. p. 147).)

not, however, provide any medical documentation at the Pre-
Disciplinary Interview.

Mitchell recommended plaintiff's removal from the Postal
Service in a letter to Labor Relations dated February 1, 2006.
(ROI 2006, Aff. C p. 9 of 9.) Mitchell advised removal "for the
following reason." (*Id.*)  Her letter goes on:

> Mr. Diggs was absent without approved leave (AWOL)
> from May 20, 2003 until June 24, 2005.  He has not
> provided us with acceptable medical documentation.
> He was given a Pre-Disciplinary Interview on January
> 18, 2006, [during] which [Mitchell] informed him of
> his unacceptable medical documentation.  To this date
> [Mitchell has received] no response.

(*Id.*)  John W. Cooke, Distribution Operations Manager, concurred
with Mitchell's recommendation.  (*Id.*)

The Postal Service issued plaintiff a Notice of Removal
based on the "charge" of "absence without leave" dated February
21, 2006.  He was terminated effective March 31, 2006.  The
Notice of Removal states, in relevant part, "a review of your
attendance record from May 20, 2003 through June 24, 2005
reflects your unscheduled absence from work and failure to
provide acceptable documentation to justify your absence.
Accordingly, you have been charged with Absence Without Official
Leave (AWOL)."  (2006 ROI Ex. 14.)

On May 19, 2006, plaintiff filed an EEO complaint alleging
that his January 18, 2006 pre-disciplinary interview and
subsequent removal constituted discrimination based on sex, age,

physical disability, and retaliation.  (Compl. ¶ 10a.)  Plaintiff
had originally requested that an AJ hear his formal EEO
complaint, but on March 7, 2007, he chose instead to add the
allegations in his 2006 EEO complaint to the instant case, which
was already pending before this Court. (Def. Att. 9 (Amended
Notice of Intention to File Suit).)  The following week, on March
14, 2007, the EEO dismissed his complaint and remanded it to the
Postal Service for the issuance of a final agency decision. (Def.
Att. 8a.)  On April 1, 2007, the agency issued its final agency
decision, which found that plaintiff "failed to establish that
[he was] subjected to sex, age, disability or retaliation
discrimination," that "the Agency met its burden of demonstrating
legitimate, non-discriminatory reason for the actions it took,"
and that plaintiff "failed to show these reasons were pretext for
intentional discrimination."  (*Id.*)

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a motion for
summary judgment shall be granted if the pleadings, depositions,
answers to interrogatories, admissions on file and affidavits
show that there is no genuine issue of material fact, and that
the moving party is entitled to judgment as a matter of law.
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246 (1986).  To be
material, the factual assertion must be capable of affecting the
outcome of the litigation; to be genuine, the issue must be

supported by sufficient admissible evidence that a reasonable fact finder could find for the nonmoving party. *Anderson*, 477 U.S. at 248; *see also Lanningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).

In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the non-moving party. *See Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1996). The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine, material issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986).

**III. ANALYSIS**

**A.   Discrimination and Retaliation Claims**

In his second amended complaint, plaintiff claims he suffered eight adverse actions which he presented in his underlying EEO complaints. (*See generally* Second Amended Complaint "Compl.") Plaintiff alleges that the Postal Service discriminated against him based on race, age, sex, disability, and/or retaliated against him by:

(1)   changing plaintiff's request for leave without pay to sick leave (Compl. ¶ 17);

(2)  changing plaintiff's job duty status from full-time regular
     to part-time flexible (*id.* ¶ 18);

(3)  denying plaintiff's request for sick leave, resulting in
     plaintiff taking leave without pay (*id.* ¶ 19);

(4)  denying plaintiff a limited duty assignment, which caused
     him to be suspended for 19.42 hours (*id.* ¶¶ 22-23);

(5)  denying plaintiff overtime (*id.* ¶¶ 24-26);

(6)  denying plaintiff discovery in his administrative complaints
     (*id.* ¶ 10);

(7)  conducting a pre-disciplinary interview of plaintiff in June
     2005 (*id.* ¶ 31); and,

(8)  removing plaintiff from the Postal Service. (*id.* ¶ 39.)

Defendant argues that some of these actions were not
adverse, and also offers legitimate, non-retaliatory explanations
for its actions.  The Court finds that some of the challenged
actions were not adverse or materially adverse, and further finds
that plaintiff failed to show defendant's explanations for its
adverse actions were pretexts for discrimination or retaliation.
Accordingly, the Court grants summary judgment for the defendant
based on plaintiff's discrimination and retaliation claims.

        **1.   Governing Law**

Under Title VII, the ADEA, and the Rehabilitation Act, the
two essential elements of a discrimination claim are that (I) the
plaintiff suffered an adverse employment action (ii) because of
the plaintiff's race, sex, age, or disability. *See* 42 U.S.C. §
2000e-16(a); 29 U.S.C.§§ 621 *et seq.*; 29 U.S.C. §§ 701 *et seq.*;
*Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir.

2008); *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493
(D.C. Cir. 2008); *see also Brown v. Brody*, 199 F.3d 446, 455
(D.C. Cir. 1999) (race discrimination under Title VII); *Barnette
v. Chertoff*, 453 F.3d 513, 515 (D.C. Cir. 2006) (age
discrimination under the ADEA); *Breen v. Dep't of Transp.*, 282
F.3d 839, 841 (D.C. Cir. 2002) (disability discrimination under
the Rehabilitation Act).  "A plaintiff must prove both elements
to sustain a discrimination claim." *Baloch v. Kempthorne*, 550
F.3d 1191, 1196 (D.C. Cir. 2008).  To prove retaliation under
these statutes, the plaintiff generally must establish that he
suffered (I) a materially adverse action (ii) because he or she
had brought or threatened to bring a discrimination claim.  *See
id.* at 1198 (*citing* 42 U.S.C. § 2000e-3(a); 29 U.S.C. §§ 621 *et
seq.*; 29 U.S.C. §§ 701 *et seq.*; *Burlington N. & Santa Fe Ry. Co.
v. White*, 548 U.S. 53, 68 (2006)).  Although the tests for
proving discrimination and retaliation both contain the term
'adverse action,' "the concept [] in the retaliation context is
broader than in the discrimination context, and can encompass
harms unrelated to employment or the workplace 'so long as a
reasonable employee would have found the challenged action
materially adverse.'"  *Franklin*, 600 F. Supp. 2d at 66 (citing
*Baloch*, 550 F.3d at 1198 n.4).

Traditionally, courts have analyzed discrimination and
retaliation claims under Title VII, the ADEA, and the

Rehabilitation Act using the three-step burden shifting framework

set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973). However, where an employer has asserted legitimate, non-

discriminatory reasons for the actions being challenged,

> the district court need not – *and should not* – decide
> whether the plaintiff actually made out a prima facie
> case under *McDonnell Douglas*. Rather, in considering
> an employer's motion for summary judgment . . . the
> district court must resolve one central question: Has
> the employee produced sufficient evidence for a
> reasonable jury to find that the employer's asserted
> non-discriminatory reason was not the actual reason and
> that the employer intentionally discriminated against
> the employee on the basis of race, color, religion,
> sex, or national origin?

*Brady*, 520 F.3d at 494 (citation omitted; emphasis in original).

This framework applies to discrimination  claims under Title VII,

the ADEA, and the Rehabilitation Act.[11]  *See, e.g.*, *Baloch*, 550

F.3d at 1197 n.2, 1200 (applying *Brady* principle to Title VII and

ADEA discrimination claims); *Kersey*, 586 F.3d at 17 n.1-2 (*Brady*

analysis applies to discrimination claims under the

---

[11] In its motion for summary judgement Defendant argues that
plaintiff does not have a disability as defined by the
Rehabilitation Act. (Def. Mem. at 18-22.) Defendant further
argues that the Court should apply the standard for determining
disability as it existed before the ADA Amendments Act of 2008.
(*Id.*) The Court concludes that it need not consider these issues
in this case. As this Circuit recently explained, once the
defendant has proffered a nondiscriminatory and non-retaliatory
rationale "it is unnecessary to consider whether the plaintiff
has actually made out the elements of a prima facie case" of
discrimination or retaliation based on disability. *Kersey v.
Washington Metro. Transit Auth.*, 586 F.3d 13, 17 n.1-2 (D.C. Cir.
2009). As discussed throughout, the Postal Service has proffered
these rationales; accordingly, the Court need not consider
whether plaintiff is, in fact, disabled.

Rehabilitation Act.) The *Brady* framework also applies to retaliation claims under these statutes. *Baloch*, 550 F.3d at 1197 n.2, 1200; *Kersey*, 586 F.3d at 17, n.1-2. Thus, where the employer has proffered a legitimate, non-retaliatory reason for a materially adverse action, the Court makes the same functional inquiry as it does in a discrimination claim: "whether plaintiff has produced sufficient evidence for a reasonable jury to find that the employer's asserted non-retaliatory reason was merely a pretext for retaliating against the employee for his prior opposition to an unlawful employment action." *Franklin*, 660 F. Supp. 2d at 66.

### 2. The Challenged Actions

#### (I) Leave Request for the Week of July 5, 1998

Plaintiff contends that the Postal Service discriminated against him on the basis of race, sex, age, and disability, when "his request for sick leave was changed to LWOP for the week of July 5-12, 1998."[12] (Pl. Opp. at 19.) Defendant has proffered a legitimate, non-discriminatory reason for the challenged action

---

[12] In his complaint, plaintiff appeared to allege that the Agency's designation of his leave request as sick leave was also retaliatory. (Compl. ¶ 17.) However, in his opposition, he fails to respond to defendant's argument as to this issue. (*See* Pl. Opp. at 1-2, 19.) It is therefore proper to treat defendant's argument as conceded. *See Sewell v. Chao*, 532 F. Supp. 2d 126, 136 n.5 (citations omitted), *aff'd* Slip Copy, No. 08-5079, 2009 WL 585660 (D.C. Cir. Feb. 25, 2009).

and disputes "*both* the existence of an adverse action *and* whether the action occurred because of discrimination." *Franklin*, 600 F. Supp. 2d at 63 (emphasis in original). "In such instances, courts may first determine the existence of an adverse action." *Id.* (citing *Baloch*, 550 F.3d. at 1196-97).

An "employment decision does not rise to the level of an actionable adverse action" sufficient to sustain a discrimination claim "unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage." *Stewart v. Lewis*, 275 F.3d 1126, 1134 (D.C. Cir. 2002)(internal citations omitted). Defendant argues that plaintiff was initially paid twice for his week of leave from July 5 - 12, 1998: once by the USPS for 40 hours of sick leave and once by OWCP for disability leave during the same time period. (Def. Mem. at 9-10.) Thus, the Agency argues, plaintiff "initially received a windfall" by getting two paychecks for the same time period. (*Id.; see also* Def. Reply at 10.) Eventually OWCP sent him a notice of overpayment and he was required to return the money he received from OWCP; however, he kept his paycheck from USPS. Because Plaintiff received full pay for the week of leave, the Agency argues, he did not suffer an adverse action. Plaintiff concedes that he did not lose pay for the week, but argues that his "leave balance was affected as a result of the

[Agency's] conduct," and the impact on his leave balance "constitutes an adverse action." (Pl. Opp. at 19.)

The Court is not persuaded that plaintiff suffered an adverse employment action. Plaintiff cites no case law, and the Court is not aware of any, that processing an employee's leave request where the only consequence was that he had to take sick leave instead of workers compensation leave, constitutes an adverse employment action. *But cf. Kline v. Springer*, 602 F. Supp. 2d 234, 243 (D.D.C. 2009) (changes to leave balance not adverse action "where the only consequence was that plaintiff had to use annual leave instead of sick leave on, at most, two occasions").

Even assuming the existence of an adverse action, plaintiff has not "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason" for treating plaintiff's leave request as one for sick leave "was not the actual reason and that the employer intentionally discriminated against" him. *Brady*, 520 F.3d at 494. The plaintiff theorizes that John Grier or Toni Grier deliberately tampered with his leave request for the week of July 5-12, 1998, changing it from a request for LWOP to a request for sick leave. (Compl. ¶ 17; Pl. Facts at 3.) Toni Grier, however, denies any involvement in receiving, processing or approving his claim for that week. (Pl. Att. 1, p. 14 (T. Grier Aff.).) John Grier also

denies that he was responsible for any changes to plaintiff's
leave request. He states that he did not take plaintiff's
telephone call in which he requested leave for the week of July
5; another employee in the absence control unit took the call and
recorded plaintiff's request as one for sick leave. (Pl's Att.
1, p. 17 (John Grier Aff.).) Grier's "approval of the request
was based on the information given on the Form 3971, leave slip,
that was taken when he called in." (*Id.*) John Grier also points
out that plaintiff signed the leave slip, which clearly stated
that he had been approved for 40 hours of sick leave. (*Id.*) In
other words, the USPS asserts that it processed plaintiff's leave
request as a request for sick leave because its manager believed
plaintiff asked to be granted sick leave, and because plaintiff
did nothing to disabuse him of that belief.

Plaintiff has provided no evidence that either John Grier or
Toni Grier was responsible for any unauthorized change to his
July 5 - 12 leave request. The evidence is uncontroverted that
he signed the slip without changing the leave designation, nor
did he "bring any discrepancy on the Form 3971 to his
supervisor's attention prior to signing the document." (Def.
Mem. at 29; *see also* Def. Mem. at 9, Def. Reply at 10.) He also
concedes that both John and Toni Grier were involved with the
accurate processing of his leave request for LWOP the following
week. (*See* Pl. Opp. at 19.) In short, plaintiff "has produced no

41

direct evidence of discriminatory animus by the decision maker
and failed to produce any other evidence that discredits the
underlying reason for" the Agency's treatment of his leave
request as a request for sick leave. *Baloch*, 550 F.3d at 1198.
"Therefore, even assuming [plaintiff] had suffered an adverse
employment action, he did not produce evidence sufficient to
overcome summary judgment on the question whether he suffered
impermissible discrimination." *Id.*

> **(ii)      Change in Status from Full-Time Regular
>            to Part-Time Flexible**

In the Postal Service's motion for summary judgment,
defendant argues that plaintiff's change in status from full-time
regular to part-time flexible was neither an adverse action nor
was it discriminatory/retaliatory.  (Def. Mem. At 10, 38-39, 42.)
Plaintiff failed to respond to either of these arguments. His
opposition to the motion for summary judgment contains no
argument or any reference to record evidence regarding his change
in status.  Given plaintiff's utter disregard for his own claim,
it is proper to treat defendant's argument as conceded.  *See*
*Lytes v. D.C. Water and Sewer Auth.*, 572 F.3d 936, 943 (D.C. Cir.
2009).[13]

---

[13] Even if plaintiff had responded to defendant's argument –
which he did not - the Court finds it unlikely that plaintiff
would be able to succeed on the merits of this claim.
Specifically, defendant presented uncontroverted evidence that
the USPS returned plaintiff to full time regular status
retroactive to April 25, 1998, the first day his status was

**(iii)      Denial of Request for Sick Leave**

In his Complaint, plaintiff alleges that "on several occasions in 1999 his request for sick leave was disapproved and changed to leave without pay." (Compl. ¶ 19.) However, his argument in opposition to defendant's motion for summary judgment is limited to a single date: he contends that the Postal Service discriminated against him based on his disability and retaliated against him when it denied his request for three hours of sick leave on September 9, 1999. (Pl. Opp. at 7-8, 19-20.) This action, which resulted in plaintiff losing three hours of pay, may well constitute an adverse or materially adverse action. *See Franklin*, 600 F. Supp. 2d at 72 (being sent home without pay satisfies prima facie case for a materially adverse action) (citations omitted).

The defendant has consistently explained that plaintiff was denied leave in error. (Def. Mem. at 23-34, 38; Def. Reply at 11.) Plaintiff's sick leave request was mistakenly routed to the injury compensation office, which does not handle sick leave. Injury compensation specialist Toni Grier told the EEO office as

_____

changed, and credited him for any salary and leave adjustments. Accordingly, no adverse action occurred. (Def. Mem. at 11; Def. Facts at ¶ 32.) Defendant also presented uncontradicted evidence that as a result of the Snow Arbitration Award and Settlement, many employees' job status changed at precisely the same time and in precisely the same way as plaintiff's did. Defendant thus presented a legitimate, non-discriminatory reason for its action, which plaintiff has failed to rebut.

far back as 2000 that she does "not normally take action on [sick] leave requests . . . it was an oversight that I did in this instance." (Pl. Att. 1, p.14 (T. Grier Aff. Oct. 11, 2000).) In her deposition in 2008, nearly eight years after her initial affidavit, Grier offered the same explanation of mistake. She explained that she "should never signed the sick leave slip. Sick leave . . . should be approved by the supervisor, not by injury comp . . . leave for an injury has to be either leave without pay, IOD or COP. Those are the only [] forms of leave that the injury compensation office handles." (Def. Deps., T. Grier Dep. at 43-44.) While plaintiff claims Grier's action "was not error or mis-communication but purposeful," (Pl. Opp. at 7,) he offers no evidence to support this accusation, or to refute the Postal Service's assertion of error. On the contrary, plaintiff provides additional support for USPS' claim of mistake by his assertion that Grier "mixed claim numbers and injuries." (Pl's Att. 1 p. 11, (Aff. A, Dated Jul. 6, 2000).)[14] This evidence further supports defendant's argument that Grier

---

[14] As set forth more fully in Section I.B.2 above, plaintiff had filed a second workers compensation claim, which was assigned a different claim number and alleged different injuries than his original claim. The OWCP found no compensable injury and denied the second claim in July 1999; nevertheless, plaintiff continued to submit requests for leave without pay based on the invalid workers' compensation claim after it had been denied. Indeed, in August 1999, plaintiff submitted three improper leave requests based on the already-denied workers' compensation claim, none of which were granted. (Pl's Ex. 1, Form 3971 dated 8/11/99, 8/12/99, 8/13/99; Def. Mem. at 23-24, 38; Def. Reply at 11.)

mistakenly construed his valid sick leave request as an improper request for leave without pay.

As this Circuit has held, once the employer has articulated a non-discriminatory explanation for its action, as the Postal Service did here,

> the issue is not the correctness or desirability of [the] reasons offered, but whether the employer honestly believes in [the] reasons it offers . . . It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible.  He must show that the explanation given is a phony reason.

*Fishbach v. D.C. Dep't of Corr's*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal quotations omitted); *see also George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false."); *Oates v. District of Columbia*, 824 F.2d 87, 93 (D.C. Cir. 1987)("[A]n ill-informed motivation, or even an illegal motivation, is not necessarily a discriminatory one.").

The Court concludes that plaintiff has failed to present the evidence necessary to rebut defendant's explanation that Grier made an administrative error by denying plaintiff's sick leave request.  Plaintiff himself acknowledged in his EEO affidavit that such a mistake may have occurred.  More important, he has not produced any evidence to show that the Agency's actions were dishonest or otherwise a pretext for discrimination or

retaliation.  The Court therefore grants summary judgment for defendant on this claim.

### (iv)        Suspension

During the summer of 1999, the Postal Service suspended plaintiff for approximately two or two and one-half days based on an incorrect determination that he was not eligible for limited duty.  As set forth more fully in section I.B.2 above, this error arose out of OWCP's rejection of plaintiff's second workers' compensation claim; specifically, when plaintiff's operations manager received notice of the rejection, he believed, incorrectly, that plaintiff was no longer entitled to limited duty status.  This error was corrected later the same summer when plaintiff prevailed in a grievance his union filed on his behalf and the Postal Service paid him for 19.42 hours of pay he lost as a result of the suspension.[15]  (1998 ROI Ex. 16, 17, 18, pp. 61-63, and p. 133 (Info. for Precomplaint Counseling).)  Plaintiff argues that these circumstances amount to illegal disability discrimination and retaliation under the Rehabilitation Act.  The

---

[15] Plaintiff claims, without support, that he received 19.41 hours of pay when the grievance settled. (Pl. Facts at 4.) Plaintiff's unsupported allegations are insufficient to withstand summary judgment.  *See, e.g.,* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322 (non-moving party's opposition must consist of more than mere unsupported allegations or denials).  Even assuming that plaintiff only received 19.41 hours' pay, plaintiff provides no evidence that his suspension lasted longer than 19.41 hours. Accordingly, the Court finds the one one-hundredth of an hour dispute between the parties irrelevant to plaintiff's claim.

Postal Service responds that plaintiff did not suffer an adverse employment action or a materially adverse action.  The Court agrees with defendant.

It is well settled in this Circuit that "absent some consequential harm or injury, a delay does not affect the terms, conditions or privileges of employment and does not constitute an adverse employment action." *West v. Potter*, 540 F. Supp. 2d 91, 95 (D.D.C. 2008)(citations omitted); *see also Runkle v. Gonzales*, 391 F. Supp. 2d 210, 224-25 (D.D.C. 2005) (delay does not constitute materially adverse action for purposes of retaliation claim).  Plaintiff does not deny that when he prevailed in his grievance, he was paid for the entire length of his suspension.

Because plaintiff does not show that he suffered any consequential harm from the delay in paying him for approximately two and one-half days of lost time, he fails to show he was subject to an adverse or materially adverse action.  Accordingly, the Court will grant defendant's motion for summary judgment on plaintiff's claim.

### (v)        May 3, 2000 Denial of Overtime

Although the complaint alleges that plaintiff was unlawfully denied overtime throughout 1999 and 2000, (Compl. ¶¶ 24-26), plaintiff's sole contention now is that he was discriminated against on the basis of race and disability when he was denied voluntary overtime on single occasion - May 3, 2000.  (Pl. Opp.

47

20-22.)  Defendant has proffered a legitimate, non-retaliatory reason for why plaintiff did not get overtime: he was ineligible for overtime on May 3, 2000 because he took two hours of annual leave during his regular shift that day.[16]  (2000 ROI, Ex. 1, p.17; Def. Mem. at 24, Def. Reply at 14; Def. Facts ¶¶ 40, 42.) Plaintiff does not dispute the factual basis for defendant's denial of overtime: he did not work all of his regularly scheduled shift on May 3, 2000 because he elected to take annual leave.  Nor does he dispute that he is covered by the Collective Bargaining Agreement between the Postal Service and the American Postal Workers Union, which provides, in relevant part, "those

---

[16] Defendant proffered two other non-discriminatory reasons for the overtime denial: (1) plaintiff was ineligible for overtime at the P&DC facility because he worked at the V Street Annex at the time, and overtime is only offered to employees who regularly work at the same location the overtime is offered; and (2) plaintiff's physical limitations made him ineligible to perform the overtime offered at the P&DC that day.  The Court finds defendant has not met its burden of production for either of these asserted reasons.  With respect to the first reason, plaintiff argues that the return to sender unit moved to the P&DC the first week in May 2000, and plaintiff's supervisor Deborah Boston admits in her affidavit that the unit may have moved to the P&DC by May 3.  (2000 ROI p. 11, Boston Aff. Mar. 19, 2001.) With respect to the second reason, plaintiff asserts that the overtime work offered "was casing mail.  The work that was performed by Plaintiff [sic] at his pay location was casing mail."  (Pl. Opp. at 21.)  While the Postal Service claims plaintiff's physical limitations precluded him from performing the overtime, the Agency has provided no evidence showing either the nature of the overtime work performed or how that work fit within plaintiff's restrictions.  Accordingly, defendant has failed to satisfy its burden of production to "offer admissible evidence sufficient for the trier of fact to conclude," that plaintiff was denied overtime for these reasons.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

absent or on leave shall be passed over," for overtime work. (2000 ROI Ex. 7b.) His sole response to this argument is that the collective bargaining agreement permits individuals to work overtime on their non-scheduled days. (Pl's. Facts p. 2.) This provision, however, is inapposite here. Plaintiff does not claim the Postal Service denied him overtime on one of his non-scheduled workdays, which are Mondays and Tuesdays. (2000 ROI Exs. 1, 3, and 4, pp. 17, 19, 20.) Rather, he claims defendant refused to allow him overtime on a Wednesday, when the evidence shows that he took annual leave during part of his regularly scheduled shift. The CBA prohibits the award of voluntary overtime under these circumstances.[17] Accordingly, the Court finds that the Postal Service has met its burden and proffered a legitimate, non-retaliatory reason for its decision not to offer plaintiff voluntary overtime. The Court further finds that plaintiff has "failed to introduce any evidence that would permit

---

[17] This provision dovetails with the general policy goals of awarding voluntary overtime work. There is "clearly a tangible monetary advantage to those who are assigned overtime work." *Bell v. Gonzales*, 398 F.Supp.2d 78, 97 (D.D.C. 2005). The Fair Labor Standards Act, which covers eligible USPS employees, requires employers to pay overtime compensation for employees working more than 40 hours per week "at a rate not less than one and one-half times the regular rate." 29 U.S.C. § 207(a)(1). In other words, premium overtime pay is intended to compensate employees for working hours in addition to those regularly assigned. It is not intended to reward employees who take vacation time during their regularly scheduled working hours, and who then seek to avail themselves of significantly higher overtime rates by pursuing voluntary overtime opportunities.

a trier of fact to believe that defendant's proffered rationale
for its decision . . . was pretextual or that its decision was
motivated by a retaliatory animus." *Franklin*, 600 F. Supp. 2d at
71 (citations omitted).

### (vi) Lack of Opportunity for Discovery in Administrative Proceedings

Plaintiff's fifth EEO complaint alleges that the Agency
breached the settlement agreement it entered into with plaintiff
in 2003. (Def. Atts. 6-7.)  However, his complaint before this
Court does not contain a breach of contract claim or a
discrimination or retaliation claim relating to the breach of
contract.  The sole allegation in the complaint which mentions
the settlement reads, in relevant part:

> In January 2003, plaintiff filed a final [sic]
> complaint with the USPS EEO Office alleging
> retaliation based on the USPS' decision to
> terminate plaintiff.  The parties entered into
> a settlement agreement. When the USPS did not
> meet the terms of the settlement agreement,
> plaintiff filed an appeal with the EEOC Office
> of Federal Operations . . . Throughout the admini-
> strative process involving the complaints filed
> in 1998, 1999, 2000 and 2003, the Plaintiff was
> not allowed to engage in any discovery.

(Compl. ¶ 10.)  The defendant correctly points out that "there is
no cause of action" for federal employees to bring retaliation or
discrimination claims based on "complaints of delay or
interference in the investigative process."  (Def. Mem. at 15
(quoting *Keeley*, 391 F. Supp. 2d at 45).) Rather, plaintiff's

"sole remedy for complaints about the administrative investigative process is to bring a de novo action in federal court" against the party allegedly engaged in the underlying discrimination, and to seek discovery relating to his claims in court. (*Id.* (quoting *Keeley*, 391 F. Supp. 2d at 45).) Plaintiff does not dispute defendant's arguments, nor does his opposition brief contain any argument with respect to the settlement, its alleged breach, or his opportunity to take discovery in the administrative proceedings. It is therefore proper to treat defendant's argument as conceded, although, as just described, it succeeds on its merits in any event. *See Lytes*, 572 F.3d at 943.

### (vii)    Pre-Disciplinary Interview on January 18, 2006

In its motion for summary judgment, defendant argues that plaintiff's pre-disciplinary interview was neither an adverse action nor was it discriminatory/retaliatory. (Def. Mem. at 16, 25-29, 41-44.) The Court agrees. *See, e.g.*, *Franklin*, 600 F. Supp. 2d at 68-69 (holding plaintiff's pre-disciplinary interview for poor attendance not an adverse action) (citing *McDaniel v. Potter*, Nos. 06-CV-0803 & 06-CV-1371, 2007 WL 3165807, *6, *8-9 (N.D. Ohio Oct. 26, 2007) (same)).

As set forth above, the Court finds that defendant's argument regarding the pre-disciplinary interview succeeds on its merits. In addition, plaintiff failed to respond to defendant's arguments. His opposition to the motion for summary judgment

contains no argument or record evidence that the pre-disciplinary interview constitutes adverse action. Accordingly, the Court may also treat claim seven as conceded. *See Lytes,* 572 F.3d at 943.

### (viii)    **Removal from Postal Service**

The Court now turns to plaintiff's most significant claim: his removal from the Postal Service in 2006. At the outset, the Court notes that the Agency's actions toward the plaintiff during the four years from when he was initially sent home, in 2002, to his ultimate removal in 2006, were far from unassailable. Indeed, the Postal Service took positions during that time which, in this Court's view, were both confusing and contradictory. However, the relevant inquiry is not whether the Postal Service treated plaintiff justly, fairly, or sensibly. It is whether the Agency asserted a legitimate, non-discriminatory reason for the termination, and if so, whether plaintiff has shown that the employer's reason was not the actual reason, but was pretext for discrimination or retaliation. *See Brady*, 520 F.3d at 494; *Baloch*, 550 F.3d at 1197 n.2; *Kersey*, 586 F.3d at 17 n.1-2. For the reasons that follow, the Court concludes that plaintiff has not met his burden.

Defendant argues that "plaintiff's employment was terminated because he failed to report to work as directed, and he failed to provide updated medical documentation showing either an inability to work or an ability to work with certain restrictions." (Def.

Mem. at 35.)  These two reasons are factually inseparable.

Defendant sent plaintiff home in the first instance because it

could not provide him with work assignments consistent with his

medical restrictions.  (2006 ROI, Aff. A. p. 33 of 39(Jan. 23,

2002 letter from J. Szarek to plaintiff); p. 35 of 39 (Sept. 27,

2004 letter from H. Jackson-Baker to plaintiff).)  Accordingly,

in the view of Agency management, plaintiff had the

responsibility to provide the Postal Service with updated

documentation of his restrictions, so the Agency could make an

informed decision about whether, and in what capacity, he could

return to duty.[18]  (Def. Facts ¶¶ 47-57; Def. Reply at 15-16; Def.

Deps., Bears-Mitchell Dep. 50, 114-116.)

    As Defendant correctly notes in its motion for summary

judgment, "the record is replete with examples of plaintiff's

failure to provide requested documentation, and in those

instances when he did provide such information, he did not

provide it to the appropriate person."  (Def. Mem. at 35.)

Specifically, the USPS clearly requested or demanded plaintiff to

provide updated medical documentation on at least eight separate

occasions:

------

    [18] This position is generally consistent with federal law
and policy.  As explained *supra* at footnote 2, the Federal
Employees Compensation Act requires that federal employees
injured on the job be compensated for their injuries, and the
Secretary of Labor requires that the Postal Service make special
efforts to employ those injured employees, who will otherwise be
eligible for compensation for doing nothing.

- January 23, 2003 letter from Helen Jackson, (Pl's Att. 3.);

- March 7, 2003 settlement agreement between plaintiff and Injury Compensation Office, (Pl's Att. 3.);

- September 27, 2004 letter from Helen Jackson-Baker to plaintiff, (Pl's Att. 3.);

- October 20, 2004 letter from Jackson-Baker to plaintiff, (P. Att. 4.);

- May 19, 2005 letter from Fannie Bears-Mitchell, (2006 ROI Ex. 7.);

- June 16, 2005 notice of pre-disciplinary interview from Bears-Mitchell to plaintiff, (*id.*, Ex. 8.);

- October 25, 2005 letter from Bears-Mitchell to plaintiff, (*id.*, Ex. 10.); and

- January 18, 2006 pre-disciplinary interview with Bears-Mitchell, plaintiff, and plaintiff's shop steward. (*id.*, Ex. 13.)

The record is undisputed that plaintiff failed to comply with six of these requests altogether, and that his response to the other two fell far short of the Postal Service's requests. As set forth in more detail in Sections I.A and I.B.4 above, although he provided one CA-17 form in response to the March 2003 settlement agreement, he produced it two months after it was due, and to the wrong office at the Agency. And while he provided one additional CA-17 form, dated November 21, 2005, to the Agency,

this belated and minimal documentation was an obviously deficient response to the Agency's multiple requests that he provide immediate evidence, updated every 30 days, regarding his medical restrictions.

Plaintiff provides no evidence that he responded to the Postal Service's repeated requests for medical documentation beyond these two isolated instances. Rather, he argues that the requests themselves were absurd because he was sent home by the Postal Service in 2002 and was never recalled to duty. (Pl. Opp. 9-10.) Plaintiff's anger is clear. In response to defendant's January 2003 letter demanding documentation of his medical restrictions, plaintiff declines to provide documentation as requested, then states that the documents he "will provide along with this cover letter, will no doubt explain" his "unsubstantiated absence." He continues, "[t]hese documents will also demonstrate beyond a reasonable doubt, the <u>stupidity</u>, <u>Incompetance</u>, [sic] and illogical reasons for [the] request" because on January 23, 2002 he received a letter from the Postal Service telling him not to report for duty. (Pl. Att. 3, p. 5 (Jan. 29, 2003 Letter from Plaintiff to USPS).)

While plaintiff's subsequent reactions to the defendant's request for documentation are marked by less colorful language, his disdain for the Postal Service's position remains evident. After receiving defendant's third request for documentation in

September 2004, plaintiff responded, not by providing the requested information, but by stating "my absence from the Postal Service is not directly related to Illness or Injury, my absence is <u>directly</u> related to Toni Grier, Compensation Unit.  Ms. Grier has not abided by the [settlement] agreement . . . I'm quite sure these documents will answer your questions."  (2006 ROI, Aff. A. P. 31 of 39 (Oct. 7, 2004 letter from Plaintiff to Jackson).)  By "these documents," plaintiff refers to the January 2002 letter sending him home and the March 7, 2003 Settlement Agreement, which itself required plaintiff to update his medical restrictions and with which plaintiff did not comply.  Plaintiff did not provide any documentation updating his medical restrictions with his October 2004 submission to the Postal Service.

Plaintiff continued to refuse to provide updated medical documentation throughout the balance of 2004 and nearly all of 2005.  He attended pre-disciplinary meetings, produced other documents, and even filed a grievance with his union, but did not provide a single piece of evidence relating to his work restrictions until December 2005.

Finally, on February 1, 2006, Bears-Mitchell drafted a recommendation for removing plaintiff from the Postal Service. The recommendation states that plaintiff was "AWOL from May 20, 2003 to June 24, 2005.  He has not provided us with acceptable

medical documentation.  He was given a pre-disciplinary interview on January 18, 2006, [at] which I informed him of his unacceptable medical documentation.  To date I have had no response." (2006 ROI, Aff. C p. 9 of 9.)  Plaintiff was terminated effective March 31, 2006.

The Court is not unsympathetic to plaintiff's position.  It is seemingly illogical that the Postal Service, which sent Plaintiff home in the first instance, would demand continuing justification from Plaintiff to remain involuntarily out of work, and would judge him "absent without leave" without ever summoning him to return to duty.  However, plaintiff's claims do not rise and fall on the logic of the employer's action.  "The question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason was his reason: not a good reason, but the true reason." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006).  The record evidence in this case demonstrates that over a period of three years, the Postal Service repeatedly, consistently and clearly told plaintiff to provide updated medical documentation and warned him that failure to do so could result in discipline up to and including termination.  Plaintiff failed to comply with these requests.  Accordingly, the Court finds that the Postal Service has carried its burden by demonstrating that it

terminated plaintiff for a legitimate, non-discriminatory reason:
failing to provide updated medical documentation.

Plaintiff makes several arguments that the Agency's reason
for terminating him was pretextual.  He argues that (1) the
notice of removal listed other reasons for his termination, which
are illegitimate; (2) the Postal Service advanced yet another
illegitimate reason for termination - plaintiff's refusal to
accept a job offer from the Agency; and (3) plaintiff was treated
less favorably than a similarly-situated woman.  After careful
consideration, and for the reasons set forth below, the Court
finds that none of plaintiff's arguments discredits defendant's
asserted non-discriminatory reason for his termination.

In his Opposition, plaintiff states: "the Postal Service put
forth two reasons for terminating [him]: 1) being AWOL from May
20, 2003 to June 24, 2005; 2) failure to provide a document to
support his statement that he was sent home on January 25, 2002.
The Plaintiff can rebut both these reasons."  (Pl. Opp. at 13,
(citing Notice of Removal).)  The Court agrees that plaintiff has
rebutted the second reason; however, he has failed to rebut the
first.

Plaintiff clearly demonstrates that he repeatedly documented
the Postal Service's decision to send him home, and that the
Agency knew it.  He correctly points out that in both 2003 and
2004 he provided the Agency with copies of *its own letter* of

January 23, 2002, which states, in relevant part, "due to the closure of the Brentwood facility . . . Plant Operations has indicated it is no longer able to accommodate your restrictions. Effective Friday, January 25, you should no longer report" for work. (Pl. Att. 3, Jan 23, 2002 Letter.) Moreover, he correctly notes that in 2004 the Postal Service acknowledged, in writing, that it had sent him home in 2002. (Pl. Opp. at 13-14, (citing Sept. 27, 2004 Letter from H. Jackson-Baker to Plaintiff).)

Defendant provided no evidence to counter plaintiff's clear and convincing evidence that the Postal Service instructed him to go home in 2002, and that he repeatedly documented that fact to the Postal Service. Indeed, defendant did not even mention this "reason" for his termination in its motion for summary judgment. The Court thus has no trouble concluding that any alleged doubts defendant had about the circumstances of plaintiff being sent home in 2002 were not a true reason for his termination.

However, the Court cannot find that the plaintiff has rebutted the other reason for removal stated in his Notice of Termination: the fact that he was AWOL. In his opposition, plaintiff argues that he did not go to work because he "was told not to report to work, effective January 25, 2002. He never received a call nor letter to return to work," accordingly, he could not have been AWOL. (Pl. Opp. at 14.) This argument misses the mark. As set forth above, the issues of plaintiff's failure to report to work and his failure to provide medical

59

documentation are in fact one and the same.  Defendant sent
plaintiff home in 2002 because it could not provide him with work
consistent with his medical restrictions.  The Postal Service
took the position that from that point on, it was plaintiff's
burden to regularly update his medical documentation.  Without
such continuing documentation, Agency managers claimed, they had
no way to know whether plaintiff had any restrictions and no way
to assess whether and in what capacity plaintiff could return to
work.  And the Agency further took the position – clearly,
repeatedly, and often in ALL CAPITAL LETTERS, that without
medical evidence demonstrating that plaintiff *did* have
restrictions, the Agency would assume that he had none, and
accordingly, was AWOL.  The record demonstrates that Postal
Service management clearly and consistently communicated its
position to plaintiff, who chose to provide little to no
information responsive to its requests.  Plaintiff offers no
evidence that the USPS selectively enforced the medical
documentation requirements against males, African-Americans,
employees with disabilities or plaintiff in particular.  Rather,
as already described, plaintiff takes the position that the
Agency's demands for continuous medical updates were foolish and
unnecessary.  The Court does not necessarily disagree with the
substance of that position.  However, this Court does not sit as
a "super-personnel department that [re]examines an entity's

business decisions", even in termination cases. *Kelly v. Mills*, -- F.Supp.2d --, 2010 WL 22669, *18 (D.D.C. Jan. 6, 2010)(internal quotations omitted). Accordingly, the Court finds that "plaintiff's disagreement with USPS policy on [the need to submit updated] medical documentation would not cause a reasonable jury to find that defendant's stated reason for plaintiff's" termination – failure to submit the required documents - "is a pretext for . . . discrimination." *Franklin*, 600 F. Supp. 2d at 73 (quoting *Lawson v. Potter*, 463 F.Supp.2d 1270, 1286 (D. Kan. 2006)).

Plaintiff next argues that his termination is unlawful because he can rebut yet another reason proffered by the Postal Service for termination: its claim that the Agency offered him a job in 2003 and/or 2005, which he turned down. (Pl. Opp. at 15-16.) Assuming *arguendo* that plaintiff has rebutted this reason, the Court's analysis does not change; as discussed above, the Court has already found that defendant has proffered one legitimate, non-retaliatory reason for terminating plaintiff, and plaintiff has failed to show that reason is pretext for discrimination or retaliation. As plaintiff concedes in his opposition brief, the employer only needs one good reason to succeed on summary judgment. (Pl. Opp. at 6, *citing Aka v. Washington Hosp. Ctr.*, 156 F.3d. 1284, 1292 (D.C. Cir. 1998) ("if the only explanations set forth in the record have been rebutted,

the jury is permitted to search for others, and may, in appropriate circumstances draw an inference of discrimination.")) *See also Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (It is only when "all legitimate reasons for [an adverse action] have been eliminated as possible reasons for the employer's actions" that the fact finder can infer that "the employer, who [the fact finder] generally assume[s] acts only with *some* reason, based [its] decision on an impermissible consideration.") (emphasis in original).

Finally, plaintiff's evidence regarding a purportedly similarly situated female co-worker is insufficient to show that defendant's termination of plaintiff was merely a pretext for gender based determination. To show that employees are similarly situated, "plaintiff . . . must demonstrate that all of the relevant aspects of [his] employment situation were 'nearly identical' to those of [his comparables]." *Bolden v. Winter*, 602 F. Supp. 2d 130, 140 (D.D.C. 2009) (citations omitted). Plaintiff has failed to meet his burden. In his opposition, plaintiff states that Ms. Thomas was injured on the job, laid off in January 2002, and called back to work at the P&DC in 2004. (Pl. Opp. at 18.) He then declares, without any evidentiary support or citation to the record, that "Ms. Thomas was never judged AWOL and she was never subjected to any pre-disciplinary hearings or asked for additional medical information or subject

to removal." (*Id.*)

To defeat a motion for summary judgment, the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 322. Plaintiff's allegations are wholly without support, and are thus insufficient to establish a genuine issue of material fact and defeat defendant's motion for summary judgment.

### B. Hostile Work Environment

Plaintiff argues that he "has made out a claim for hostile work environment based on race and retaliation." (Pl. Opp. at 22.) He does not specify what alleged conduct he bases his claim upon, but states generally that "the conduct of which the plaintiff complains were [sic] not so isolated or discrete but consisted of several actions which were ongoing at the same time." (Opp. at 23.) In the absence of any other indication from the plaintiff, the Court infers from this statement that plaintiff bases his hostile work environment claim on the same acts upon which he bases his discrimination/retaliation claims.

Plaintiff cannot rely on the discrete acts upon which he bases his claims of discrimination and retaliation claims to establish he was subject to a hostile work environment. To

prevail on a hostile work environment claim, "a plaintiff must show that his employer subjected him to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Baloch*, 550 F.3d at 1201 (citations omitted.) Another judge on this Court has persuasively explained the distinction between disparate treatment and hostile work environment claims, in addition to the perils of permitting plaintiff to conflate the two:

> The dangers of allowing standard disparate treatment claims to be converted into a contemporaneous hostile work environment claim are apparent. Such an action would significantly blur the distinctions between both the elements that underpin each cause of action and the kinds of harm each cause of action was designed to address. A hostile work environment [claim]. . . must be based on one unlawful employment practice of pervasive, insulting, discriminatory conduct that makes the plaintiff's day-to-day work environment severely abusive. Therefore, cobbling together a number of distinct, disparate acts will not create a hostile work environment. For example, if an employee is discrimin-atorily denied ten promotions over a period of time, that pattern of conduct may give rise to ten separate claims under Title VII, but it would not create a hostile work environment claim based on pervasive intimidation, insult and ridicule.

*Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 82 (D.D.C. 2007) (alterations, citations, and internal quotation marks omitted) (Huvelle, J.).

The *Rattigan* court's reasoning applies with equal force in this case, and clearly demonstrates why plaintiff's attempt to raise a hostile work environment claim is unavailing. Plaintiff

has done nothing more than reassert his disparate treatment and retaliation claims - all of which are discrete employment actions - and baldly claim that these same actions constitute a hostile work environment. The conclusory invocation of the term "hostile work environment" is insufficient to transform the nature of his claims. *See Rattigan*, 503 F. Supp. 2d at 81 ("Plaintiff should not be permitted to 'bootstrap' his alleged discrete acts of discrimination and retaliation into a broader hostile work environment claim." (*quoting Keeley*, 391 F. Supp. 2d at 51; *Lester v. Natsios*, 290 F. Supp. 2d 11, 31-33 (D.D.C. 2003) (rejecting the plaintiff's argument that "the specific alleged incidents of discrimination she has raised collectively constitutes a hostile work environment"; noting that "it is not at all clear that mere reference to alleged disparate acts of discrimination against plaintiff can ever be transformed, without more, into a hostile work environment claim.")).

Even assuming *arguendo* that plaintiff could "simply regurgitate his disparate treatment claims in an effort to flesh out a hostile work environment claim," his effort fails given the facts of this case. *Smith v. Jackson*, 539 F. Supp. 2d 116, 138 (D.D.C. 2008). Plaintiff's claims in this case constitute eight discrete instances of alleged discrimination/retaliation over a period of eight years. Some of the acts alleged are as temporally minute as missing three hours' sick leave or losing an overtime opportunity on a single day. The alleged conduct simply

does not translate into "pervasive, insulting, discriminatory conduct that makes the plaintiff's day-to-day work environment severely abusive," which is the standard he must meet to sustain a hostile work environment claim. *Rattigan*, 503 F. Supp. 2d at 82 (*citing Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002); *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998).) Accordingly, the Court grants summary judgment on plaintiff's hostile work environment claim.

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment [Doc. No. 52] is **GRANTED.** An appropriate order accompanies this Memorandum Opinion.

**Signed:**      **Emmet G. Sullivan**
                 **United States District Judge**
                 **March 31, 2010**